UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

AISHA K. THOMPSON                          CIVIL ACTION

VERSUS                                     NUMBER: 12-2569

CAROLYN W. COLVIN, ACTING                  SECTION: "F"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


### REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 11, 12).

Aisha K. Thompson, plaintiff herein, filed the subject application for SSI benefits on November 3, 2010, with a protective filing date of October 25, 2010, alleging disability as of December 15, 2008.  (Tr. pp. 121-126, 134).[1]  In a Disability Report that

_____

[1] At an administrative hearing that was subsequently held on October 12, 2011, plaintiff, through counsel, amended the alleged

appears in the record, the condition resulting in plaintiff's inability to work was identified as arthritis of the spine. (Tr. pp. 146-153). Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on March 1, 2011. (Tr. pp. 71-74). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on October 12, 2011 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 76-78, 22-59). On November 4, 2011, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 7-21). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 5-6, 1-4). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff does not delineate any specific issues for review but instead broadly challenges the Commissioner's finding that she was not disabled. (Rec. doc. 11). Relevant to that broad challenge are the following findings that were made by the ALJ:

---

onset date to October 25, 2010, the date her application for SSI benefits was protectively filed. (Tr. pp. 27-28).

1.   [t]he claimant has not engaged in substantial gainful activity since October 25, 2010, the application date (20 CFR 416.971 *et seq*.).

2.   [t]he claimant has the following severe impairment: disorders of the spine (20 CFR 416.920(c) and <u>Stone v. Heckler</u>, 752 F.2d 1099, 1101 (5th Cir. 1985)).

3.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can never climb ladders, ropes, or scaffolds.  She can only engage in occasional bilateral overhead reaching; and only occasional rotation, flexion, or extension of the neck.

5.   [t]he claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   [t]he claimant was born on December 1, 1977 and was 32 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   [t]he claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.   [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.   [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.   [t]he claimant has not been under a disability, as defined in the Social Security Act, since October 25, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. pp. 12, 13, 16, 17).

Judicial review of the Commissioner's decision to deny SSI

benefits is limited to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is

4

defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  <u>Harrell</u>, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.

> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

> 4. if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

> 5.  if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that

she has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

The medical evidence that was generated during the relevant time period[2] begins with a treatment note dated April 6, 2010 from Dr. Shelton Barnes.  Although characterized as a check-up, complaints included a lump on the right leg, chest and rib pain, nausea, and neck and shoulder pain.  Various tests were ordered and plaintiff was to return to the clinic in three weeks.  (Tr. p. 191).  Blood work was subsequently done on April 8, 2010.  (Tr. pp. 201-202).  A venous doppler exam of the right lower extremity was performed on April 12, 2010 which revealed no evidence of deep vein

---

[2] Under 20 C.F.R. §416.912(d), the Commissioner is required to develop the medical history of an SSI claimant for at least twelve months prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary.  As plaintiff protectively filed her application for SSI benefits on October 25, 2010 and alleged an onset date of that same date (note 1, supra), the relevant time period thus begins in September of 2009.

thrombosis.  (Tr. p. 221).  Chest x-rays taken on that same date were unremarkable with no evidence of acute pulmonic process.  (Tr. p. 222).  Similar studies of the right foot revealed no evidence of fracture or acute bony process.  (Tr. p. 223).  X-rays of the right knee were unremarkable and those of the thoracic spine showed only slight thoracoscoliosis with minimal degenerative findings.  (Tr. pp. 224, 225).  Radiographic studies of the cervical spine demonstrated a loss of lordotic curvature with degenerative findings, particularly at C4-5 and C5-6.  (Tr. p. 226).  Plaintiff returned to Dr. Shelton to obtain the test results on April 27, 2010.  (Tr. p. 190).

On August 7, 2010, plaintiff underwent further x-rays of the cervical spine at the direction of Dr. Bryan Seely.  That testing revealed mild discogenic degenerative changes at C4-5 and C5-6 and mild bilateral uncovertebral joint hypertrophy at those same levels but no evidence of instability on the flexion or extension views.  (Tr. pp. 233-234).  Plaintiff was next seen by Dr. Shelton on September 2, 2010 for complaints of pain in the head, chest, and right arm up to the shoulder with a tingling feeling.  Her left side also hurt.  The diagnosis was cervical spine disease; Tramadol and Amrix were prescribed.  (Tr. p. 189).

On September 9, 2010, plaintiff underwent an MRI of the cervical spine without contrast in connection with her complaints of neck pain and bilateral arm pain and weakness.  The impressions

were:  1) a severe broad-based posterior disc bulge at C4-5 with a broad-based right foraminal/extraforaminal superimposed disc protrusion resulting in severe right-sided foraminal narrowing and a central/left paracentral subligamentoric disc protrusion/extrusion; and, 2) a prominent disc bulge at C5-6 and a moderate disc bulge at C3-4 with foraminal narrowing at C4-5 and C5-6, most significant at C4-5 on the right.  (Tr. pp. 219-220). Plaintiff returned to Dr. Barnes to obtain the MRI test results on September 23, 2010.  She continued to complain of pain in the head and neck, occasional chest pain, and a tingling feeling which had diminished since her last visit.  Plaintiff's pain was alleviated by Tramadol but she did not take it every day and walking made her pain worse.   The assessment was cervical spine pain versus herniation versus a congenital cervical spine abnormality. Plaintiff was to be referred to the Tulane Neurology and Orthopedic Clinics.  (Tr. p. 188).

On October 7, 2010, plaintiff was evaluated by Dr. Seely at the Tulane University Hospital & Clinic.  She reported problems with her neck as well as pain in the arms for the past year, with the pain being an "8" out of 10 at its worst.  Radicular symptoms into both upper extremities were also reported, the left greater than the right, although the precise cause was unclear.  At times, lying down and resting alleviated plaintiff's symptoms as did propping pillows up underneath her neck.   Upon physical

examination, plaintiff had a negative Hoffman's sign bilaterally, normal sensation in the upper extremities, and normal deep tendon reflexes in the upper extremities.  Cervical spine range of motion was within normal limits for flexion, extension, and rotation although some pain was elicited at the end range of rotation, the right greater than the left.  Muscle tone in the upper extremities was also within normal limits despite a bit of forward posture with rounded shoulders and a bit of a forward head.  As set forth in the recent MRI report, the assessment was bulging discs at C4-5, C5-6, and C3-4 with some foraminal narrowing.  Plaintiff was to be started on Neurontin and physical therapy with the hope that those conservative treatment modalities might alleviate her symptoms. (Tr. 231-232).  X-rays taken on that date revealed mild discogenic degenerative changes at C4-5 and C5-6, mild bilateral uncovertebral joint hypertrophy at those levels, and no evidence of instability on the flexion or extension views.  (Tr. pp. 233-234).

Plaintiff returned to Dr. Barnes on November 4, 2010 for a routine follow-up visit.  She had started physical therapy on October 12, 2010 at a rate of two sessions per week but there had been no change to her pain.  Plaintiff had a steady gait and was able to bend halfway to touch her toes.  The assessment was cervical spine pain/disc bulge.  She was to consult further with the Orthopedic and Neurology Clinics and was to continue with physical therapy.  (Tr. p. 187).

9

The following day, plaintiff was seen again by Dr. Seely.  She reported no relief with physical therapy but Neurontin did help her rest more at ease at night.  The assessment was cervical spine pain with radicular symptoms into the upper extremities.  A CT myelogram was to be ordered.  (Tr. p. 230).  That testing was performed on November 18, 2010 which revealed a small posterior disc-osteophyte complex at C4-5 and C5-6 indenting the ventral CSF space but no spinal stenosis identified.   There was also neural foraminal narrowing on the right at C4-5 associated with prominent degenerative changes in the uncovertebral joint with associated cut-off of the right C4-5 nerve root sheath.  (Tr. pp. 217-218).

On November 22, 2010, plaintiff completed the Administration's "Function Report-Adult" form that is designed to elicit information on how her condition limited her activities.  There, plaintiff indicated that her arms and hands got tingly and weak, sometimes numb-feeling, when holding or moving heavy items about.  Pain was also elicited with reaching overhead.  Daily activities included reading and watching television.  Plaintiff cared for her children with occasional assistance from her mother but was unable to walk or sit for long periods of time, was unable to style her hair, and was unable to move her head up or down for long periods of time.  Pain while sleeping was sometimes relieved by remaining in a certain position.  Plaintiff was able to prepare simple meals, wash dishes, and do laundry but sometimes needed assistance with those

tasks.   She did not mop or move items that were too heavy.
Plaintiff did not own a car and thus did not drive but was able to
use public transportation for grocery shopping, doctor's
appointments, or to attend school-related activities for her
children.  She visited with others in person or via telephone and
attended church every Sunday.   Lifting was limited to objects
weighing twenty to thirty pounds for short periods of time and she
could walk five to six blocks before needing to rest for twenty
minutes.  Although she could follow instructions and got along well
with others, she did not handle stress or changes in routine well.
(Tr. pp. 168-175).

Plaintiff was next seen by Dr. John Davis of the Tulane
Orthopedic Clinic on December 13, 2010.  She related experiencing
neck pain with radiating symptoms into the upper extremities over
the previous year which was affecting her ability to work in the
shrimp factory for the last couple of months.   Upon physical
examination, plaintiff had a positive Spurling's sign with
weakness, with strength in the biceps and wrist extension being 4/5
on the left as compared with the right.   The Hoffman's sign was
negative.   The assessment was cervical spondylitic
myeloradiculopathy, particularly at the C4-5 and C5-6 levels.
Surgical options were discussed as plaintiff's condition was now
limiting her ability to work.  (Tr. p. 229).  Plaintiff was seen
again by Dr. Davis for pre-operative clearance on January 10, 2011

with surgery to be performed on January 25, 2011.  (Tr. p. 251).

On January 25, 2011, plaintiff underwent an anterior cervical corpectomy of C5, anterior cervical diskectomies of C4-5 and C5-6, an anterior fibular strut allograft fusion of C4 to C6, and anterior cervical plating with a dynamic Medtronic plate at C4 to C6.  (Tr. pp. 252-253).  Post-operative x-rays demonstrated the hardware to be intact without evidence of failure or loosening.  (Tr. pp. 254-257).  Plaintiff was next seen by Dr. Davis on February 16, 2011 and was described as "doing quite well".  She had some spasm in her shoulder but functional activities in the upper extremities were otherwise normal.  Sensation and pulses were intact and x-rays showed good placement of the graft and plate. Plaintiff was to return to the Clinic in three weeks.  (Tr. pp. 240, 243).

On March 1, 2011, employers from the State Disability Determination Services reviewed plaintiff's file as it was then extant at the initial level of the Commissioner's administrative review process.  After doing so, they determined that plaintiff could frequently lift and/or carry twenty-five pounds; could sit, stand, and/or walk for six hours per eight-hour workday; could push/pull on an unlimited basis; had no postural limitations; was limited in overhead reaching bilaterally with only occasional overhead lifting; and, had no visual, communicative, or environmental limitations.  Although plaintiff's condition was

12

severe and prevented her from performing her past work, it was believed that it would improve to the point where she could perform other unskilled, light-level jobs existing in the national economy. (Tr. pp. 61-70).

Plaintiff was seen again by Dr. Davis on March 14, 2011 and was again said to be doing well. While she did have some trapezial pain, she had no arm pain, numbness, or weakness. Upper extremity strength was "excellent", sensation was intact, and the Hoffman's sign was negative. X-rays taken at the time revealed good placement of the bone graft and plate, good maintenance of disc space height above and below, and good spinal alignment. Plaintiff was to return in three weeks for removal of her collar and placement in a soft collar. (Tr. pp. 270, 265-266). By April 4, 2011, plaintiff was still complaining of some shoulder pain which was thought to be related to the collar. There was full sensation and normal strength in the upper extremities and the Hoffman's sign was negative. Reflexes were unchanged. X-rays showed good placement of the graft and plate but diminished bone formation around the fibular strut at the upper and lower ends and a posterior fusion from C4 to C6 was discussed as a possibility. Plaintiff was to remain in a soft collar and was to return to the clinic in three weeks. (Tr. pp. 269, 263-264). Despite good upper extremity strength and sensation on April 25, 2011, plaintiff was experiencing neck pain, particularly spasm on the left side. A CT

13

scan was to be scheduled and plaintiff was given refills on her
Phenergan and Vicodin.  (Tr. pp. 268, 261-262).

Plaintiff returned to Dr. Davis on May 16, 2011 following the
CT scan which was said to show good placement of the graft and a
wide decompression with open foramen and without significant root
compression.  Most of plaintiff's residual pain was thought to be
muscular and was to be treated with a muscle relaxer and possibly
an antiinflammatory.  Elavil was to be continued at night.  Since
plaintiff was felt to be healing well she was to return in six
months for follow-up.  (Tr. p. 267).  By July 25, 2011, plaintiff
was still complaining of stiffness in the neck and some basically
axial neck pain but no radiating arm pain, numbness, or perception
of weakness.  Physical examination findings were unchanged with
good strength and intact sensation.  X-rays revealed good placement
of the graft and plate.  Given the largely unremarkable findings,
plaintiff was simply prescribed a course of physical therapy.  (Tr.
p. 282).[3]/  Plaintiff attended eleven of fifteen biweekly physical
therapy sessions beginning on August 10, 2011 until September 29,
2011.  On the first session, plaintiff's sitting, standing, and
gait were within normal limits and she reported no tingling to the

---

[3]/ On December 13, 2010, Dr. Davis had authored a prescription
pad note in which he indicated that plaintiff was limited in her
ability to work.  (Tr. p. 284).  A second note was written on April
4, 2011 to the effect that plaintiff was currently unable to work
due to spinal surgery.  (Id.).  By July 25, 2011, Dr. Davis' note
reflected that plaintiff was unable to sit for long periods of time
due to her cervical spine condition.  (Id.).

extremities since June.  By the last session, plaintiff stated that her pain was an average of "4" out of 10 and that she had experienced 20% improvement to her condition.  (Tr. pp. 296-302).

As noted earlier, a hearing <u>de</u> <u>novo</u> before an ALJ went forward on October 12, 2011.  After the documentary exhibits were admitted into evidence, plaintiff's counsel moved and was granted leave to amend the disability onset date from December 15, 2008 to October 25, 2010, the date her application for SSI benefits was protectively filed.  Plaintiff then took the stand and was questioned by her attorney.  She was thirty-three years old at the time, had three children ages eighteen, fifteen, and ten, stood 5'3" tall and weighed 170 pounds after gaining twenty to thirty pounds post-surgery, and had completed ten grades of formal education.  Past work included that as a sitter, shrimp packer, fast food worker, and operator of a "sweet shop" out of her own home.  In terms of her medical issues, plaintiff recalled her surgery on January 25, 2011 and testified that she remained in constant pain despite the doctor's assurances to the contrary.  The pain was situated from the neck to just above the shoulder and she experienced muscle spasms four to five times per week that disrupted her sleep.  For relief, plaintiff took muscle relaxers which she still had a quantity of but otherwise relied on over-the-counter pain medications and ice packs.  Plaintiff testified that the recently-completed course of physical therapy had not improved

her condition at all.  She had a further follow-up appointment with Dr. Davis scheduled for October 24, 2011 whom she had not seen since completing physical therapy.  (Tr. pp. 24-36).

In touching upon her daily activities, plaintiff testified that there were some chores that she was capable of performing but not others.  Heavy lifting, for example, was problematic. Plaintiff became uncomfortable when washing dishes and tried to minimize the time that she spent on her feet while cooking.  Her mother assisted with shopping and her daughters did the laundry. Plaintiff did not drive and had no hobbies.  She testified that she could lift a gallon of milk with both hands, could walk six to seven blocks without stopping, and could go up and down the stairs leading to her residence.  Plaintiff became fidgety and experienced unbearable pain after sitting for fifteen minutes which was the case as the hearing progressed.  She occasionally took twenty to thirty-minute naps as her prescribed muscle relaxers made her sleepy and affected her concentration.  Since undergoing surgery, plaintiff had experienced numbness and tingling to her hands on only two occasions.  Reaching above shoulder level was also problematic.  Dr. Davis had reportedly limited plaintiff from lifting in excess of eight pounds.  (Tr. pp. 36-42).

Upon being questioned by the ALJ, plaintiff clarified that the two episodes of post-surgery tingling in the fingers were limited to the left hand.  She occasionally had to rest her left arm when

16

washing her hair but was able to kneel and bend to wash her hair in the bathtub. Plaintiff acknowledged that some of the exercises that she had performed during physical therapy were helpful but others were more challenging or painful. When asked if she would submit to further physical therapy, plaintiff testified that she would do so if recommended by her doctor although there were certain maneuvers that she preferred to avoid. In answer to the question of why she could not work, plaintiff testified that the combination of pain, work absences, and being on medication rendered her unable to complete work-related duties. However, when asked whether she could perform a job that allowed for a sit/stand option, plaintiff testified in the affirmative. (Tr. pp. 42-48).

Deborah Bailey, a VE, was the next witness to take the stand. She began by classifying the exertional and skill demands of plaintiff's past work as a shrimp packer, sitter/home healthcare aide, fast food worker, and sandwich maker/counter sales. The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who was limited to light-level work with only occasional overhead reaching bilaterally; who was precluded from performing work involving ladders, ropes, or scaffolds; and, who could only occasionally engage in rotation, flexion, or extension of the neck. With those limitations in mind, the VE testified that the individual described in the hypothetical question could not perform

17

any of plaintiff's past work.  However, the described individual could function as an information clerk, a general office clerk, and an interviewer, with significant numbers of such jobs existing in the national and local economies.  (Tr. pp. 48-56).

To the hypothetical question as originally framed, the ALJ then added an at-will sit/stand option provided that the person was not off task more than 10% of the time.  With those added limitations in mind, the VE testified that the described individual could not perform any of plaintiff's past work but could engage in the three other jobs that she had previously identified.  Finally, the ALJ posed a third hypo to the VE which added the ability to leave her work station at unscheduled times due to severe pain, complications secondary to surgery, and chronic spinal difficulties resulting in work not being completed in a timely fashion, and reduced concentration, persistence, and pace in doing simple, routine tasks on a regular basis in an eight-hour day.  Presented with those added limitations, the VE testified that the individual could not perform plaintiff's past work or any other work.  Plaintiff's counsel had no questions for the ALJ but he did argue that plaintiff's condition was akin to the individual described in the third hypothetical question.  (Tr. pp. 56-59).

As noted earlier, in her cross-motion for summary judgment, plaintiff does not delineate any specific issues for judicial review.  However, she does complain of the ALJ's assessment

18

regarding the level of pain that she experiences and the effect that such pain has on her ability to work as such limiting effects are largely subjective in nature and are not susceptible of meaningful quantification.

The law is clear that an ALJ must consider a claimant's subjective complaints of pain and other limitations. <u>Scharlow v. Schweiker</u>, 655 F.2d 645, 648 (5th Cir. 1981). However, it is within the ALJ's discretion to determine their debilitating nature. <u>Jones v. Bowen</u>, 829 F.2d 524, 527 (5th Cir. 1987). Pain is considered disabling within the meaning of the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment." <u>Hames v. Heckler</u>, 707 F.2d 162, 166 (5th Cir. 1983). The burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Harper v. Sullivan</u>, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's subjective testimony against the objective medical evidence that has been produced. <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing <u>Jones</u>, 702 F.2d at 621 n.4). The ALJ may discredit a plaintiff's subjective complaints of pain and attendant physical limitations if she carefully weighs the objective evidence and articulates her reasons for doing so. <u>Anderson v. Sullivan</u>, 887 F.2d 630, 633 (5th Cir. 1989)(citing

19

Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir. 1988)).  It must be remembered that the evaluation of a plaintiff's subjective complaints is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court.  Harrell, 862 F.2d at 480.  The mere existence of pain or the fact than an individual is unable to work without experiencing pain is not an automatic ground for obtaining Social Security benefits.  Owen v. Heckler, 770 F.2d 1276, 1281 (5th Cir. 1985)(citing Jones, 702 F.2d at 621 n.4).

In her written opinion of November 4, 2011, the ALJ did not find that plaintiff experienced no pain whatsoever or that she had no limiting effects because of it.  Rather, she found that such limitations were not of the extent alleged such that they would preclude the performance of work that was consistent with the residual functional capacity assessment that the ALJ arrived at. Among the factors that the ALJ cited in discounting plaintiff's allegations of a complete inability to work were the objective findings that were made by Dr. Davis in the months following plaintiff's surgery in January of 2011.  On March 14, 2011, despite having some trapezial pain, plaintiff had no arm pain, numbness, or weakness and had excellent strength in the upper extremities, intact sensation, and a negative Hoffman's sign.  On April 4, 2011, plaintiff had full sensation and normal strength in the upper extremities and reflexes were unchanged from the previous visit.

Good upper extremity strength and sensation were noted on April 25, 2011 despite some neck pain and spasm on the left.

By May 16, 2011, a CT scan had been performed which demonstrated good placement of the graft, a wide decompression with open foramen, and no significant nerve root compression. Plaintiff's residual pain was believed to be muscular in nature and susceptible to treatment in the form of muscle relaxers and possibly an anti-inflammatory rather than pain medication. On July 25, 2011, plaintiff had no radiating arm pain, numbness, or perception of weakness with good strength and intact sensation. Only physical therapy was prescribed through which plaintiff reportedly experienced 20% improvement and her pain was reduced to a manageable level of "4". Sitting and standing were within normal limits as was plaintiff's gait. Such findings may properly be considered by the ALJ in adjudicating plaintiff's disability status. Adams v. Bowen, 833 F.2d 509, 512 (5th Cir. 1987). At the administrative hearing, plaintiff testified to performing household chores that did not involve heavy lifting, grocery shopping, and the ability to walk six to seven blocks without stopping. Plaintiff's ability to engage in such activities is not indicative of someone who is unable to perform any work whatsoever. Leggett v. Chater, 67 F.3d 558, 565 n.12 (5th Cir. 1995). Pain was managed only with over-the-counter medications. Most importantly, in answer to the question of whether she could perform a job that

21

allowed for a sit/stand option, plaintiff testified in the affirmative. As that option was included within the second hypothetical question that was posed to the VE at the administrative hearing, the jobs that the VE identified in answer thereto provides substantial evidence to support the ALJ's decision.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this 18th day of _____September_____, 2013.

_____
UNITED STATES MAGISTRATE JUDGE

22